FILED

08/10/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0606

DA 18-0606

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 202N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

KEVIN J. PARISIAN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. DDC-17-237
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Shannon L. Sweeney, Attorney at Law, Anaconda, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  June 2, 2021

Decided:  August 10, 2021

Filed:

                        _____
                                Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      Kevin J. Parisian appeals from his August 23, 2018 sentence to the Montana State Prison for forty years with twenty suspended for the crime of aggravated kidnapping in violation of § 45-5-303, MCA. We affirm.

¶3      The State charged Kevin Parisian (Parisian) with aggravated kidnapping and assault with a weapon, alleging that, on April 20, 2017, Parisian held Peggy Ahenakew (Ahenakew) against her will at his apartment throughout the evening before holding her at knifepoint during a stand-off with police.

¶4      At trial, the jury heard testimony from Ahenakew, Parisian's former girlfriend. She testified that, as she and Parisian walked to the store, she told Parisian that she was leaving him and ending the relationship when they returned to his apartment. Upon their return, an angry Parisian began throwing things, at Ahenakew, including beer and a Bluetooth speaker. He broke and hid her phones. Parisian slapped her until her nose bled, punched her, and choked her. Parisian hit Ahenakew behind the ear causing her to briefly lose consciousness. At one point, when Parisian momentarily turned his back on Ahenakew, she ran down the stairs and attempted to make a run down the street, but Parisian ran after

2

her, pulled her by the hair, and brought her back to the apartment. Parisian called her a "fucking bitch" and said that she "wasn't leaving."

¶5 In the apartment, Parisian pushed Ahenakew on the bed, grabbed her face, smeared her makeup, and said she "wasn't fucking going anywhere." She responded: "Okay," at which point Parisian said "Yeah, you could go." Ahenakew pieced together her phone and called a cab, but when it arrived Parisian told the driver that the cab was not needed and sent it away. Ahenakew unsuccessfully tried to signal to the cab driver through the kitchen window to call the police. At one point, Ahenakew screamed for help, hoping someone in the building would hear her.

¶6 Eventually, Ahenakew was able to call her daughter from the landline and whispered to her to call police. When Parisian found out, he said he was going to make the officers shoot him and began watching the doors.

¶7 Ahenakew testified to intermittent violence throughout most of the four hours between when they returned from the store and when the police arrived and that, once Parisian became violent, she never felt free to leave. A downstairs neighbor testified to hearing fighting, loud screams, and the sound of items being thrown as well as to witnessing a cab drive up.

¶8 Great Falls Police Officers Tad Kimmett (Kimmett) and Jared Wolf (Wolf) testified that upon arrival to the apartment complex, both observed the apartment door fly open rapidly with a woman later identified as Ahenakew standing in the doorway. Kimmett observed that Ahenakew was upset and had an expression of fear and pain on her face,

3

non-oxidized blood on her clothing, and injuries and redness on her face. Ahenakew called to the officers: "Over here, I'm over here."

¶9 The officers then observed Parisian appear in the doorway with an object that appeared to them to be a handgun. Both officers drew their weapons and Kimmett ordered Parisian to "[d]rop it." As Parisian set the item down, Kimmett realized the object was actually a cordless power drill and he lowered his pistol slightly. However, Parisian then grabbed Ahenakew from behind, holding her in front of him. Kimmett said, "Let her go. Get away." Parisian pulled a knife from his waistband and held it to Ahenakew's throat. Kimmett said "Drop the knife. Drop the knife," aiming his pistol at Parisian again. Parisian did not comply. Ahenakew was able to pull away from Parisian to her left, opening Kimmett's line of sight to the right side of Parisian's torso. Kimmett fired two rounds and Parisian stumbled backward, fell onto a couch in the apartment, and went unconscious. Kimmett observed the apartment in a state of disarray, noting overturned furniture and broken glass in the living room. Ahenakew testified to substantially the same course of events.

¶10 The emergency room doctor who treated Ahenakew testified to noticing bruises from recent trauma in locations where Ahenakew described pain, including her head, arm, anterior chest, left ear, and forehead.

¶11 Agent Anthony Poppler (Poppler) of the Department of Justice testified to conducting an independent investigation of the apartment and noted indications of a struggle or fight. Poppler documented bloodstains throughout the apartment, as well as damaged phones and Bluetooth speaker. Poppler indicated that the bullet trajectory was

4

consistent with Kimmett's version of events. A knife was recovered near where Parisian fell.

¶12 Parisian testified in his defense, stating that Ahenakew had taken his money and keys and the two had "wrestled" as he attempted to retrieve them. According to Parisian, the altercation eventually led to him breaking the glass on the entertainment center, followed by him cutting his finger on glass, at which point he "got madder," flipped a card table, and slapped Ahenakew a number of times. Parisian testified that he did not attempt to prevent Ahenakew from making a phone call. He also testified that, at some point between when he and Ahenakew had returned from the store and when the police arrived, he took a nap anywhere from 45 to 90 minutes in length. He denied dragging Ahenakew back into the house when she went outside, testifying that she could have left.

¶13 Parisian testified that at the time Ahenakew opened the door as police arrived, he was sitting on the couch, though he did not "know what the timeframe [was]." He testified that he had a cordless drill in one hand and a drywall saw in the other and that Kimmett had said, "[s]how me your hands," at which point Parisian moved away and was shot.

¶14 The jury was instructed that "[a] person commits the crime of Aggravated Kidnapping if the person knowingly or purposely, and without lawful authority restrains another person by using or threatening to use physical force with the purpose to inflict bodily injury on, or terrorize" the victim. The jury convicted Parisian of aggravated kidnapping and assault with a weapon. The District Court sentenced Parisian to Montana State Prison for 40 years, with 20 suspended, for aggravated kidnapping in addition to 20 years, concurrently and with no time suspended, for assault with a weapon.

5

¶15    Parisian appeals the sentence for aggravated kidnapping. He acknowledges that he did not object to the sentence at the time it was imposed, but requests that we exercise plain error review over his claim. This Court may exercise its discretion to review unpreserved claims of error that implicate a fundamental right and when such review is necessary to prevent manifest miscarriage of justice, compromise to the integrity of the judicial process, or unsettled questions of fundamental fairness. *State v. Akers*, 2017 MT 311, ¶ 13, 389 Mont. 531, 408 P.3d 142.

¶16    Section 45-5-303(2), MCA, states in pertinent part:

> Except as provided in 46-18-219 and 46-18-222, a person convicted of the offense of aggravated kidnapping shall be punished by death or life imprisonment as provided in 46-18-301 through 46-18-310 or be imprisoned in the state prison for a term of not less than 2 years or more than 100 years and may be fined not more than $ 50,000, *unless the person has voluntarily released the victim alive, in a safe place, and with no serious bodily injury, in which event the person shall be imprisoned in the state prison for a term of not less than 2 years or more than 10 years* and may be fined not more than $ 50,000.

(Emphasis added.)

¶17    Parisian argues that unless the State proves to a jury beyond a reasonable doubt that the defendant has *not* "voluntarily released the victim alive, in a safe place, and with no serious bodily injury," a defendant may not be sentenced to more than ten years. Parisian points to *Apprendi v. New Jersey*, which requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be proven beyond a reasonable doubt. 530 U.S. 466, 490-91, 497, 120 S. Ct. 2348, 2362-63, 2367 (2000) (invalidating, as an "unacceptable departure from the jury tradition," a sentencing scheme allowing a

sentence enhancement upon the sentencing judge finding, by a preponderance of the evidence, that the underlying crime was committed for a specified purpose).

¶18 Parisian argues that § 45-5-303, MCA, creates three separate aggravated kidnapping crimes, each with a different maximum sentence of ten years, 100 years, or death or life imprisonment. Relevant here, whether a judge can impose up to 100 years or only up to ten years turns upon whether a defendant "voluntarily released the victim alive, in a safe place, and with no serious bodily injury." Section 45-5-303(2), MCA. The "statutory maximum"—sentencing beyond which requires additional facts to be proven beyond a reasonable doubt—for *Apprendi* purposes is the "maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely v. Washington*, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004). Parisian argues that the "statutory maximum" here is ten years, as the facts reflected in the jury verdict or admitted by Parisian do not establish that he *did not* voluntarily release Ahenakew "alive, in a safe place, and with no serious bodily injury." The alleged error is that Parisian was sentenced beyond the statutory maximum on the basis of facts that were not proven to a jury beyond a reasonable doubt.

¶19 Parisian misapplies *Apprendi* to the facts of this case. But in any event, Parisian does not demonstrate that manifest miscarriage of justice, compromised judicial integrity, or unsettled questions of fundamental fairness will arise if we do not exercise plain error review over this case. Here, the evidence clearly demonstrated that Parisian had not "voluntarily released [Ahenakew] alive, in a safe place, and with no serious bodily injury." Ahenakew testified that she never felt free to leave once Parisian became violent. She also

7

testified to screaming for help, attempting to signal to a taxicab driver through the window for help, and eventually whispering to her daughter over the phone to call the police. Medical reports corroborated Ahenakew's testimony that she had been injured by a number of blunt force traumas, including to the chest and head, and police found obvious signs of a violent struggle on Ahenakew and in the apartment, the noise of which was corroborated by a neighbor. The harrowing nature of this protracted violent struggle and Ahenakew's desperate attempts to get help strongly suggest that Ahenakew would have left the apartment long before police arrived, had she been "voluntarily released."

¶20    Moreover, testimony that Parisian had hidden or broken Ahenakew's phones, prevented her from getting into a taxicab, and dragged her back into the house after attempting to flee demonstrates that he was not "voluntarily realeas[ing]" her.

¶21    Additionally, the evidence established that an ongoing aggravated kidnapping was occurring as Parisian held Ahenakew hostage at knifepoint during the standoff with police. It is undisputed that Parisian's interaction with police ended upon Parisian being shot, not any voluntary action by Parisian to release Ahenakew.

¶22    Overwhelming evidence admitted at trial established that Ahenakew was not "voluntarily released" from at least one instance of aggravated kidnapping by Parisian. As such, we need not exercise plain error review of Parisian's *Apprendi* claim in order to avoid a potential manifest miscarriage of justice, compromise to the integrity of the judicial process, or unsettled questions of fundamental fairness. We decline to exercise discretionary plain error review of Parisian's conviction.

¶23    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24    Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR